IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| NICHOLAS GAYDOS, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | |
| ) | |
| DUKE ENERGY BUSINESS SERVICES LLC, ) | |
| 525 S. Tryon Street ) | |
| Charlotte, NC 28202, ) | Civil No._____ |
| ) | |
| *Serve Resident Agent*: ) | JURY TRIAL DEMANDED |
| ) | |
| CT Corporation System, ) | |
| 160 Mine Lake Court, Suite 200 ) | |
| Raleigh, NC 27615, ) | |
| ) | |
| *Defendant*. ) | |

**CIVIL COMPLAINT FOR EQUITABLE
AND MONETARY RELIEF AND DEMAND FOR JURY**

Plaintiff Nicholas Gaydos brings this action against Defendant Duke Energy Business Services LLC ("Duke Energy") for violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*. ("the ADA").

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this is an action arising under the laws of the United States, specifically the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*.

2. This Court has personal jurisdiction over Defendant because it is headquartered in Charlotte, North Carolina.

3. Venue in this judicial district and division is proper pursuant to 28 U.S.C. §

1

1391(b)(2) because Defendant does significant business and has its corporate headquarters in this judicial district.

4. Venue in this judicial district and division is also proper pursuant to 28 U.S.C. § 1391(b)(1) because Defendant has extensive and deliberate contacts in this judicial district.

**PARTIES**

5. Plaintiff is a resident of the State of North Carolina and is a U.S. citizen.

6. Defendant is a Delaware limited liability company with its headquarters located at 525 S. Tryon Street, Charlotte, North Carolina 28202.

**ADMINISTRATIVE EXHAUSTION**

7. On April 8, 2025, Gaydos timely filed charges of discrimination, failure to accommodate, and retaliation with the United States Equal Employment Opportunity Commission's Charlotte District Office.

8. More than 180 days have passed since Gaydos filed with the Equal Employment Opportunity Commission, and it has not yet issued any right to sue letter or charge closure.

**FACTUAL ALLEGATIONS**

9. Gaydos is a United States Army veteran with significant combat experience and has been diagnosed with an anxiety disorder which is likely attributable to his experience in the Army working as an intelligence collector.

10. Duke Energy hired Gaydos in or around January 2019 as an intelligence analyst.

11. Duke Energy initially hired Gaydos as an independent contractor on a non-permanent contract, but it subsequently offered Gaydos a position as a full-time employee in or about the summer of 2019 based on Gaydos' positive performance record.

12. Duke Energy promoted Gaydos to a role as a senior intelligence analyst in or

about the summer of 2019 based on Gaydos' positive performance record.

13. Gaydos primarily worked from Duke Energy's headquarters location in Charlotte, NC, and he reported to his first-line supervisor Margeret Fenner, who served as director of threat intelligence and investigations.

14. Duke Energy provided Gaydos with positive feedback on his performance in each year from 2019 through 2023, and it awarded Gaydos a performance-related bonus each year from 2019 through 2023.

15. Gaydos was first diagnosed with Attention-Deficit/Hyperactivity Disorder ("ADHD") in or about mid-2021, and his physicians prescribed Adderall to treat this condition.

16. Gaydos disclosed his ADHD diagnosis and the fact that he treated the condition by taking Adderall to his supervisor Margaret Fenner, Defendant's lead intelligence analyst who held day-to-day supervisory responsibilities related to Gaydos' work, Forrest Kelly, and fellow team members Timothy Quinn and David Kobe, during a team meeting that occurred in or about early-2023.

17. Fenner and Kelly both acknowledged Gaydos' disclosure of his disability during the team meeting in or about the summer of 2023 by responding to or interacting with Gaydos' comment.

18. Duke Energy failed to initiate any conversation about potentially needed or available accommodations with Gaydos following his disclosure of his ADHD in or about the summer of 2023.

19. Gaydos began using an available standalone cubicle outside of Fenner's office as his primary work location in or about September 2023, as his ADHD condition impacted his ability to perform work that required deep focus in the shared office space he previously used.

20. Fenner instructed Gaydos that he could not use the standalone cubicle several weeks after Gaydos began using the workspace, and Gaydos informed Fenner that he was using the space because the frequent disruptions that occurred in the shared office space prevented him from performing his duties as efficiently.

21. Fenner responded to Gaydos' explanation by stating that he should move back to the shared office space, irrespective of the negative impacts to Gaydos' ability to work in that space due to frequent interruptions, purportedly because it was important for him to share a workspace with his peers.

22. Fenner thereafter permitted Kelly to work remotely for weeks at a time from Kelly's second home in Virginia rather than requiring Kelly to use the shared office that Fenner cited as vital to Gaydos.

23. Kelly cancelled a scheduled meeting with Gaydos in or about October 2023 due to a conflict related to Kelly's child's school activities and rescheduled the meeting for the following morning before the beginning of the official workday.

24. Gaydos informed Kelly that he could not attend the meeting in person at the time Kelly had rescheduled it to because he had to drop his own stepdaughter off at school at 7:30 AM and would be driving to the office immediately thereafter.

25. Kelly reported the difficulty in finding a time to meet with Gaydos to Fenner, who reprimanded Gaydos for not being available at the time and instructed Gaydos that he should update his calendar for periods outside of normal business hours and told Gaydos that this is what Corey Kleban, a similarly situated employee, did.

26. Gaydos later asked Kleban if he updated his calendar for conflicts outside of working hours, and Kleban informed Gaydos that he had never done so.

27. Fenner provided Gaydos with constructive feedback on his public speaking in or about late-2023 and informed Gaydos that she wanted him to increase the amount of public speaking he performed to improve upon those skills.

28. Gaydos informed Fenner during their conversation that he experienced significant anxiety related to public speaking and requested that he be able to make mock presentations to combat the effects of his anxiety.

29. Fenner agreed that the mock presentations were a good idea and agreed to provide them but later cited time constraints as precluding her ability to provide them and did not provide an alternative arrangement to address Gaydos' anxiety.

30. Duke Energy failed to initiate any conversation about potentially needed or available accommodations with Gaydos following his disclosure of the impacts of his anxiety disorder to Fenner in or about late-2023.

31. Fenner informed Gaydos in or about March 2024 that Duke Energy required Gaydos to complete twelve threat actor profiles in 2024, which marked a significant increase from the requirement to complete eight in 2023, and thereafter it expected Gaydos to have one profile complete for each month of the year that had passed even though it told Gaydos about the increased expectation roughly a quarter of the way into the year.

32. Duke Energy discriminated against Gaydos by placing him onto an unsubstantiated performance improvement plan on or about July 2, 2024.

33. Duke Energy's informed Gaydos that he was being placed onto a performance plan because purportedly his productivity was low compared to his peers.

34. Duke Energy's performance improvement plan for Gaydos included planned 30-day, 60-day, and 90-day check-in meetings between Fenner and Gaydos to discuss his progress.

35. Gaydos filed a complaint with Duke Energy's human resources department on or about August 5, 2024, about the lack of accommodation for his ADHD and anxiety disorders. He also identified the performance improvement plan as unsubstantiated and discriminatory in nature, and he requested an investigation into his allegations.

36. Fenner informed Gaydos after she was informed of his discrimination and accommodation complaint that she would have permitted him to use the cubicle had she understood that it was a request for accommodation, but she then did not offer Gaydos the ability to work from the cubicle again, offer him any specific accommodations, or ask him what accommodations he thought would help him perform his duties.

37. Duke Energy provided Gaydos with an accommodation request form after he filed his complaint. Gaydos thereafter informed Fenner during their 60-day performance improvement plan check-in that the accommodation request form was only suited for employees affected by physical limitations and not those who were impacted by mental conditions. Fenner responded by telling Gaydos that his performance had exhibited significant improvement and then discouraged Gaydos from submitting the disability accommodation request form.

38. Fenner provided Gaydos with positive feedback on his performance improvements during both their 30-day and 60-day check-in meetings.

39. Duke Energy, despite Fenner's positive feedback, discriminated against Gaydos on the basis of his disability and retaliated against Gaydos for his complaint of discrimination and failure to accommodate when it terminated his employment on October 14, 2024.

40. Gaydos has sustained economic damages and mental anguish as the result of Duke Energy's illegal actions, and he will continue to sustain damages into the foreseeable future.

## COUNT I
### ADA-Disability Discrimination
### 42 U.S.C. § 12101 *et seq.*

41. Plaintiff adopts and incorporates by reference the averments of the preceding paragraphs as if fully set forth herein.

42. The Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. makes it unlawful for an employer to discriminate against any individual with respect to his terms, conditions, or privileges of employment because of his disability.

43. Plaintiff is a member of a protected class under the ADA because he is a qualified individual with a disability, and he disclosed that disability to Defendant.

44. Defendant discriminated against Plaintiff when it placed him on a performance improvement plan on or about July 2, 2024.

45. Defendant discriminated against Plaintiff when it terminated his employment on or about October 14, 2024.

46. Any asserted reason for these disciplinary actions is illegitimate pretext for unlawful discrimination.

47. As a result of Defendant's violations of the ADA, Plaintiff has suffered and is continuing to suffer injuries, including, but not limited to, damage to his career and damage to his professional and personal reputation.

## COUNT II
### ADA-Failure to Accommodate
### 42 U.S.C. § 12101 *et seq.*

48. Plaintiff incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

49. The Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* makes it

unlawful for an employer to discriminate against any individual with respect to his terms, conditions, or privileges of employment because of his disability, including by not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer.

50. Plaintiff is a member of a protected class under the ADA, as Plaintiff disclosed his ADHD and anxiety disorder diagnoses to his supervisor and members of his team, subsequently did so to human resources, and Defendant declined to make reasonable accommodations to Plaintiff's known limitations when he was an otherwise qualified individual.

51. Defendant failed to make reasonable accommodation for Plaintiff's known mental limitations by refusing to allow him to use an available private cubicle and instead forced him to work in a shared office from in or about September 2023 through the remainder of his employment.

52. Defendant failed to make reasonable accommodation for Plaintiff's known mental limitations by failing to provide the mock public speaking sessions that it had agreed to provide to him to address his public speaking anxiety.

53. Defendant failed to make reasonable accommodation for Plaintiff's known mental limitations by providing Plaintiff with a reasonable accommodation request form which was well suited only for physical disabilities not mental ones and then dissuading Plaintiff from completing the form when he raised this concern.

54. Defendant discriminated against Plaintiff because of his disability by failing to engage in the interactive process in assisting Plaintiff with obtaining a reasonable

accommodation, with which, Plaintiff could perform the essential functions of his position.

55. Defendant discriminated against Plaintiff based on his disability by failing to show that accommodating Plaintiff was an undue burden.

56. As a result of Defendant's violations of the ADA, Plaintiff has suffered and is continuing to suffer injuries, including, but not limited to, damage to his career and damage to his professional and personal reputation.

**COUNT III**
**ADA-Retaliation**
**42 U.S.C. § 12101** *et seq.*

57. Plaintiff incorporates the allegations in the foregoing paragraphs as though fully alleged herein.

58. The Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* makes it unlawful for an employer to discriminate against any individual because such individual has opposed any act or practice made unlawful by" the ADA.

59. Plaintiff is a member of a protected class under the ADA, as Plaintiff filed a complaint opposing the discrimination he had sustained based on his disability and his supervisor's failure to accommodate his disability.

60. Defendant retaliated against Plaintiff when it terminated his employment on or about October 14, 2024.

61. Any asserted reason for these disciplinary actions are illegitimate pretext for unlawful retaliation.

62. As a result of Defendant's violations of the ADA, Plaintiff has suffered and is continuing to suffer injuries, including, but not limited to, damage to his career and damage to his professional and personal reputation.

**PRAYER FOR RELIEF**

Based on the foregoing, Plaintiff respectfully requests that the Court enter judgment in his favor and award to him the following relief:

a. Legal and equitable relief, including reinstatement;

b. Economic, compensatory, and punitive damages;

c. Liquidated damages;

d. Attorney's fees and costs;

e. Pre-judgment interest; and

f. Any other relief that this Court deems just and equitable.

**DEMAND FOR A JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and pursuant to the local rules of this Court, Plaintiff demands a jury trial as to all issues so triable.

Respectfully submitted,

/s/ *Charles H. Rabon, Jr.*
Charles H. Rabon, Jr.
N.C. State Bar No. 16800
Rabon Law Firm, PLLC
413 S. Sharon Amity Rd., Suite C
Charlotte, NC 28211
Telephone: 704-247-3247
Fax: 704-208-4645
crabon@usfraudattorneys.com

R. Scott Oswald, Esq. (*pro hac vice* to be filed)
Nicholas Woodfield, Esq. (*pro hac vice* to be filed)
The Employment Law Group, P.C.
1717 K Street NW, Suite 1110
Washington, D.C. 20006
(202) 261-2812 (telephone)
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
nwoodfield@employmentlawgroup.com